**G.M. WALLS, Jr., Appellant,**

v.

**FIRST STATE BANK OF MIAMI, et al., Appellees.**

No. 07–94–0184–CV.

Court of Appeals of Texas, Amarillo.

May 30, 1995.

Rehearing Overruled June 26, 1995.

118

Miles O'Loughlin, J.A. Martindale, Pampa, Edwards Terry Baiamonte & Edwards, William R. Edwards, III, Corpus Christi, for appellant.

Templeton Smithee Hayes & Fields, Joe W. Hayes, Amarillo, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

G.M. Walls, Jr. perfected this appeal from a take-nothing summary judgment rendered in his actions for malicious prosecution, libel, and slander against First State Bank of Miami, Bill Beall, individually and as trustee of the First State Bank of Miami Employee Profit Sharing Trust, Ronnie Gill, Donald Jenkins, Keith Locke, Doyle Smith, and David Locke (collectively, the Bank). Determining there is a material fact issue concerning the affirmative defense on which the summary judgment was rendered, we will reverse and remand.

Walls initiated his actions following the dismissal of an indictment charging him with the criminal offense of unauthorized sale or disposition of secured property, a 1985 Suburban. The underlying events disclosed by the summary judgment evidence were that on 20 August 1984, Walls executed a promissory note in the amount of $24,171.40, payable to the First State Bank of Miami, Texas, and secured by a 1985 Suburban.[1] Offering to purchase the Suburban in May of 1987, Walls's father gave him a $13,000 check, which Walls delivered to the Bank assuming the money would be credited toward the note, and secured a release of the Bank's lien on the automobile. However, Scott Daugherty, then a vice-president of the Bank, fraudulently appropriated some of the funds

---

1. The loan forming the basis of the note was actually made from the First State Bank of Miami Employee Profit Sharing Plan. The Plan was later transferred to the First National Bank of Amarillo; however, the servicing of the Walls loan, along with a few other small loans, was left with the First State Bank of Miami.

to his own use, and did not credit the funds to Walls's note.

Almost a year later, while conducting an investigation into Daugherty's fraud upon the Bank, Bank personnel discovered Daugherty's conversion of the $13,000 check and his attendant failure to credit Walls's note. On 29 April 1988, the Bank credited the note and, in June of 1989, renewed the note with an unsecured one in the amount of $2,600. The following month, the Bank's board of directors agreed to collect the unsecured renewal note through litigation if and when it became delinquent.

Walls filed for bankruptcy protection in the fall of 1991, and the renewal note was discharged by the United States Bankruptcy Court for the Northern District of Texas on 7 April 1992. Later that same month, the Bank, pursuant to federal statute,[2] reported to the Federal Bureau of Investigation numerous fraudulent activities committed by Daugherty against the Bank. However, due to a shortage of manpower, the FBI responded that it was unable to pursue any of the alleged offenses, and that it had referred the case to the Roberts County district attorney's office. The board of directors of the Bank then authorized their president to disclose to the district attorney any information the Bank possessed concerning Daugherty's alleged criminal activity.[3]

The president of the Bank and other Bank personnel met, and had other conversations, with the assistant district attorney, Tracey Warner,[4] in late April of 1992. The employees discussed Daugherty's fraudulent ventures, and Warner requested that a memo be written concerning that activity. One of the employees furnished Warner with a copy of a memo, which had been drafted by Bank personnel, entitled "Daugherty Employee Profit Sharing" and including, *inter alia,* a 10 May 1991 summary of the Walls account.

The summary recorded activity in Walls's account from 8 August 1985, the date of the original note, through the date of the writing of the summary, and included information concerning Daugherty's conversion of the $13,000 check and the Bank's crediting of Walls's account upon discovery of the deception. There was no indication in the summary that the lien on the Suburban had been released, and none of the Bank personnel disclosed to Warner that the note had been renewed and later discharged in bankruptcy.

After scanning the memo, Warner inquired about Walls, and the Bank president responded, "[A]ll we [the Bank] ever wanted from him was our money," later explaining in his deposition he was referring to "his debt to the profit-sharing plan [which] had been discharged [in bankruptcy]." The Bank employees testified they did not believe Walls had done anything illegal with respect to the note, and that Warner had expressed no interest in pursuing further legal action against Mr. Walls; however, the personnel did not convey to Warner their belief in Walls's innocence.

Although Warner conceded that she could not recollect her conversations with the Bank employees concerning Walls, and that she had transcribed in the notes of her conversations with them only employee criticisms of Daugherty and none of Walls, she asserted that the Bank employees presented her with inaccurate and incomplete information and withheld other significant information. Warner also recalled that Bank personnel conveyed to her a desire that the information they supplied concerning Walls and Daugherty be presented to the grand jury, and that the employees expressed an opinion that Walls had committed criminal acts. She acknowledged that she would not have pursued the matter involving Walls further had the

---

**2.** The Code of Federal Regulations requires an insured nonmember bank to file a criminal referral report when it suspects one of its employees, officers, directors, agents, or other institution-affiliated parties of having committed or aided in the commission of a crime involving the insured nonmember bank. 12 C.F.R. § 353.1(a)(1) (1994).

**3.** The Bank officers operated under a policy that required them to obtain permission from the board of directors before disclosing any Bank or customer information to outside entities.

**4.** Warner subsequently married and, at the time of her deposition, her name was Tracey Jennings Blades, but for continuity, she will be referred to as Warner.

employees told her he had done nothing illegal.

Without having examined the title to the Suburban, the collateral for the note, or contacting Walls, Warner presented the matter concerning Walls to the grand jury. In hindsight, Warner admitted the title to the Suburban was the best evidence of whether a lien existed on the vehicle, and wished that she had called Walls for an explanation before presenting the case to the grand jury.

On 28 September 1992, the grand jury returned an indictment against Walls for the unauthorized sale or disposition of secured property, the 1985 Suburban.[5] Afterwards, the district attorney moved for the dismissal of the indictment, and it was dismissed on 29 October 1992.

Thereafter, on 4 December 1992, Walls filed the suit underlying this appeal, alleging malicious prosecution, libel, and slander based upon the disclosures made by the Bank concerning the note. The Bank filed its motion for summary judgment on the ground that the Annunzio–Wylie Anti–Money Laundering Act insulated it from liability.[6] The section of the act upon which the Bank relied provides in pertinent part that:

> Any financial institution that makes disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States or any constitution, law or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure.

31 U.S.C.A. § 5318(g)(3) (1994).

The trial court granted the motion on the ground asserted by the Bank, and rendered the take-nothing summary judgment, signing the judgment on 15 March 1994. Walls perfected his appeal, contending with two points of error, the second of which contains three sub-points, A, B, and C, that the court erred in granting summary judgment on the basis of § 5318(g)(3), *supra.*

■ Initially, in our consideration of Walls's contentions, we observe that the Bank, as the defendant moving for summary judgment on the basis of its presented affirmative defense provided by § 5318(g)(3), was entitled to judgment only if it established the absence of genuine issues of material fact, and conclusively proved all essential elements of its defense as a matter of law. In determining whether there is a disputed material fact issue precluding summary judgment, evidence favorable to Walls will be taken as true, and every reasonable inference from the evidence, as well as any doubts, will be resolved in his favor. *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984).

In logical progression, we first address the latter two sub-points under Walls's second point of error. By these sub-points, he contends that (B) if § 5318 was intended to apply to the facts of this cause, it does not bar his claim because the statute was enacted after the commission of the conduct of which he complains; and (C) if § 5318 is construed to apply to events antedating its enactment, then the statute is unconstitutional as applied, because it deprives him of his property without due process of law in violation of the Fifth Amendment of the United States Constitution.

Walls argues that the affirmative defense provided by § 5318 is not applicable to his common-law tort causes of action because the statute became effective when the President of the United States signed it on 28 October 1992, some six months after Bank personnel first met with Warner, and thirty days after he was indicted. Presenting the argument, Walls relies upon the analysis employed in

---

5. The grand jurors, one of whom was a member of the Bank's board of directors, and another of whom was the wife of a different board member, also returned an indictment against Daugherty, which was subsequently dismissed upon the motion of the district attorney.

6. The Annunzio–Wylie Anti–Money Laundering Act was enacted as Title XV of the Housing and Community Development Act of 1992. Pub.L. No. 102–550, 106 Stat. 3672 (now codified at 42 U.S.C.A. § 5301). The Act was signed into law by the President of the United States on 28 October 1992.

*Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1489, 128 L.Ed.2d 229, 243 (1994), to decide whether a section of the 1991 Civil Rights Act was to apply to a case pending on appeal when the Act was enacted.

The application of the *Landgraf* analysis to this cause must, of course, be referenced to the timing of the decisive events. The indictment against Walls was returned on 28 September 1992; the Annunzio–Wylie Anti–Money Laundering Act became effective on 28 October 1992 (statement by President George Bush upon signing H.R. 5334, 28 Weekly Comp.Pres.Doc. 2186 (Nov. 2, 1992)); the indictment against Walls was dismissed on 29 October 1992; Walls filed his actions against the Bank on 4 December 1992; and the take-nothing summary judgment was signed on 15 March 1994.

In *Landgraf,* the Supreme Court announced that when a case implicates a federal statute enacted after the events in suit, the Court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. *Landgraf v. USI Film Products,* —— U.S. at —— – ——, 114 S.Ct. at 1505, 128 L.Ed.2d at 261–62. The Act with which we are concerned has an "effective date" section declaring that:

> The provisions of this Act and amendments made by this Act shall take effect and shall apply upon the date of the enactment of this Act, unless such provisions or amendments specifically provided for effectiveness or applicability upon another date certain.

Housing and Community Development Act of 1992, § 2, 106 Stat. at 3681. Thus, § 5318 took effect on 28 October 1992, when President Bush signed the Act.

Though the statute, by its terms, was to apply on and after 28 October 1992, Congress indicated no opinion as to the categories of pending cases to which the statute was to apply. The explicit wording of the statute left open the question whether it was to apply only to cases in which a final judgment had been rendered, or was also to apply to suits pending on the date of its enactment, but in which a final adjudication had not been made. The question was unanswered for the reason that no legislative history per se accompanied the draft of § 5318 to the White House for enactment, because such legislation was added during a House–Senate conference. 139 Cong.Rec. E57–02 (daily ed. Jan. 5, 1993) (statement of Hon. Stephen L. Neal in the House of Representatives).

■ Consequently, there was no clear indication whether Congress intended § 5318 to apply to Walls's causes of action, which accrued when he was indicted on 28 September 1992, a month before the statute became effective on 28 October 1992, and which were not subjected to a final adjudication until more than sixteen months later on 15 March 1994. Then, we must turn to the second step of the *Landgraf* analysis, which compels us to determine whether the new statute would have a prohibited "retroactive effect" on Walls's causes of action; *i.e.,* whether it would impair vested rights Walls possessed when he acted. If the statute does have a retroactive effect, then the traditional presumption against statutory retroactivity comes into play and teaches that the statute does not govern absent clear congressional intent favoring such a result. *Id.* at ——, 114 S.Ct. at 1505, 128 L.Ed.2d at 262.

However, the Supreme Court made it clear in *Landgraf* that a statute does not have a prohibited retroactive effect merely because it was applicable to a case arising from conduct antedating the statute's enactment. *Id.* at —— – ——, 114 S.Ct. at 1498–99, 128 L.Ed.2d at 254–55. Rather, the Court stated, the conclusion that a particular statute operates "retroactively" comes at the end of a process of judgment concerning whether the new provision attaches new legal consequences to events completed before its enactment. *Id.* at ——, 114 S.Ct. at 1499, 128 L.Ed.2d at 255.

■ In this regard, a law has a suspect retroactive effect if it takes away or impairs vested rights created under existing laws. *Houston Indep. Sch. v. Houston Chronicle,* 798 S.W.2d 580, 585 (Tex.App.—Houston [1st Dist.] 1990, writ denied). To be vested, a right must be more than a mere expectancy based on an anticipated continuance of an existing law, *City of Dallas v. Trammell,* 129

Tex. 150, 101 S.W.2d 1009, 1014 (1937); it must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from the demand of another. *Aetna Ins. Co. v. Richardelle,* 528 S.W.2d 280, 284 (Tex.Civ.App.— Corpus Christi 1975, writ ref'd n.r.e.). The triggering event for the vesting of a right is the resolution of the controversy or the entry of a final judgment on the claim. *Houston Indep. Sch. v. Houston Chronicle,* 798 S.W.2d at 585.

██ If, before a right becomes vested in a person, the law upon which it is based is modified, that particular person no longer has a remedy to enforce his claim, and if final relief has not been granted to him on the enforcement of a demand before such modification, then no relief can be granted on his demand after the effective date of the revision. *Aetna Ins. Co. v. Richardelle,* 528 S.W.2d at 284. And, this remains true even where the cause of action or defense at issue is one founded in the common law. *Ellerbe v. Otis Elevator Co.,* 618 S.W.2d 870, 873 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.), *cert. dism'd,* 459 U.S. 802, 103 S.Ct. 24, 74 L.Ed.2d 39 (1982). Case law establishes that no person has a property or vested interest in any rule of the common law, and neither the Constitution of the United States nor of this State forbids the abolition of common law rights of action to attain a permissible legislative object. *Sowders v. M.W. Kellogg Co.,* 663 S.W.2d 644, 648 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Ellerbe v. Otis Elevator Co.,* 618 S.W.2d at 873. Consequently, only final, nonreviewable judgments will be accorded the dignity of vested, constitutionally guarded rights, *see Ellerbe v. Otis Elevator Co.,* 618 S.W.2d at 873, and a law will be deemed to have a prohibited retroactive effect only when it impairs those rights. *Landgraf v. USI Film Products,* — U.S. at ——, 114 S.Ct. at 1498, 128 L.Ed.2d at 254.

██ It follows from the application of these principles that the interposition of § 5318 against Walls's common law tort claims, which had not been adjudicated at the time of the statute's enactment,[7] did not have a prohibited retroactive effect on his causes of action, because the interposition did not impair a vested right of his. Then, the affirmative defense provided by § 5318 was available to the Bank to provide a safe harbor for disclosures of information concerning possible violations of law.

This decision is supported by comments made by one of the authors of the Annunzio–Wylie Anti–Money Laundering Act subsequent to its enactment. Congressman Annunzio, asked by a major United States bank to clarify the applicability of the statute to disclosures of financial institutions made prior to the enactment of the statute, responded, in pertinent part, as follows:

> My colleagues and I in Congress wanted to assure that financial institutions which reported suspicious transactions should not be held liable to any person under any law, Federal, state or local, for making such disclosures. I [sic] was my intent as the author of the provision that it would apply to any such disclosure, regardless of whether the disclosure was made prior or subsequent to the date of the enactment of the Act.

139 Cong.Rec. E57 (daily ed. Jan. 5, 1993) (statement by Hon. Frank Annunzio, Chairman of the Subcommittee on Financial Institutions, Washington, D.C.) The preceding statements indicate that, even if § 5318 was construed as having a "retroactive" effect, the congressional intent would favor that result in this cause. *Landgraf v. USI Film Products,* — U.S. at ——, 114 S.Ct. at 1505, 128 L.Ed.2d at 262.

Consequently, we overrule sub-points B and C of Walls's second point of error. We now consider sub-point A thereof, by which Walls contends that the affirmative defense provided by § 5318 was not intended to provide protection for the type of conduct of which he complains.

The thrust of Walls's argument under the contention is that there are fact issues re-

---

7. Indeed, at the time of the enactment, Walls's claims had not even been introduced into the judicial process. *Cf. Sample v. Freeman,* 873 S.W.2d 470, 476 (Tex.App.—Beaumont 1994, no writ) (holding a case on file is "in the judicial process").

garding the Bank's affirmative defense, which preclude summary judgment. He asserts that § 5318 applies to reports of *"possible* violations of law," not intentional acts of providing information known to be false. It is undisputed, Walls continues, that the Bank knew he had done nothing illegal, yet Bank personnel "expressed an opinion to [Warner] that Walls had committed criminal acts." Therefore, Walls concludes, fact issues were raised with respect to whether the Bank reported information concerning a possible violation of law by Walls to the district attorney's office, and if so, whether the Bank reported such information knowing it to be false.

The Bank replies that if Warner's testimony amounted to any evidence, it might be argued that there existed a genuine issue of fact whether the information disclosed to Warner was to report a possible violation of law by Walls. However, the Bank continues, its burden of proof was to establish that the disclosure of information concerning Walls was made in connection with "any possible violation of law," not one specifically committed by Walls. Therefore, since its disclosure, in which Walls's name was mentioned, was to report a possible violation of law by Daugherty, the protection of § 5318 was invoked. The protection exists regardless of its motivation, the Bank argues, because Congress did not engraft a requirement of "good faith" to invoke the protection.

In the course of its reply, the Bank suggests that, because of Warner's difficulty in remembering the conversations she had with various Bank personnel, her testimony only created a surmise or suspicion, and failed to controvert the clear, positive and direct testimony of the Bank's personnel. The referenced testimony was that the meeting with Warner was to discuss Daugherty's fraudulent acts, that the Bank employees thought the memo pertained only to Daugherty's abuse, that Warner first mentioned Walls in the meeting, and that the disclosure to Warner was done in connection with a disclosure of a possible violation of law by Daugherty.

Implicit in the Bank's reply is that Warner's testimony should be discredited and its testimony accepted; however, as is evident

from principles earlier stated, the function of the courts in a summary judgment proceeding is not to try the cause by weighing the evidence or determining the credibility of its source, but to determine if there are any issues of fact to be tried. *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 931 (1952). Conformably, we must disregard the Bank's testimony which conflicts with Warner's testimony that Bank personnel expressed an opinion that Walls had committed criminal acts and a desire that the information be presented to a grand jury, and that they misrepresented the information about Walls by providing her with incomplete and inaccurate information, and by withholding other vital information from her. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985).

█ It is recognized that the legislative history of § 5318 manifests an intent by that section's drafters to provide banking institutions and their personnel with broad immunity for disclosures made pursuant to the terms of that section. Yet, even absent a good faith requirement in the statute, there is nothing in it or its legislative history to indicate the drafters intended to clothe banking institutions and their employees with impunity when falsely reporting possible violation of the law. Such a notion, even aside from being foreign to our principles of law and sense of justice, was dispelled by the stated purpose of § 5318 "to provide the broadest possible exemption from civil liability for reporting of *suspicious* transactions." 139 Cong.Rec. E57–02 (daily ed. Jan. 5, 1993) (statement by Hon. Frank Annunzio) (emphasis supplied).

Given the conflicting summary judgment evidence on the issue of the Bank's report to Warner regarding Walls, and the principle that the version most favorable to Walls must be accepted, *Valley Stockyards Company v. Kinsel,* 369 S.W.2d 19, 20 (Tex.1963), there are unresolved the material fact issues whether the Bank reported a possible violation of law with respect to Walls, and if so, whether such report was made by the Bank knowing it to be untrue. Therefore, the Bank failed to establish as a matter of law its affirmative defense on which the take-noth-

ing summary judgment was rendered. *McFadden v. American United Life Ins. Co.,* 658 S.W.2d 147, 148 (Tex.1983). Walls's subpoint A, and his first point of error that the court erred in granting summary judgment, are sustained.

Accordingly, the summary judgment is reversed, and the cause is remanded to the trial court.