Terry "Bo" DIGBY, Appellant,

v.

TEXAS BANK, et al., Appellee.

No. 08–96–00234–CV.

Court of Appeals of Texas,
El Paso.

March 6, 1997.

Rehearing Overruled April 23, 1997.

Eric C. Bohnet, Midland, Robert E. White, Childs, Bishop & White Law Offices, Odessa, for Appellant.

Jack Q. Tidwell, McMahan, Tidwell, Hansen, & Atkins, P.C., Odessa, Layton Zant Woodul, Cecil Kuhne, Crenshaw, Dupree & Milam, Lubbock, for Appellee.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

McCLURE, Justice.

This is an appeal from a summary judgment granted against Terry "Bo" Digby, plaintiff below and Appellant herein, on his claim of malicious prosecution against Texas Bank and the officers and directors of the Bank, co-defendants below and collectively the Appellee herein. We reverse.

### SUMMARY OF THE EVIDENCE

By a security agreement dated October 11, 1989, Digby and his wife obtained a loan for $100,000 from Texas Bank. As part of the collateral for the loan memorialized in the October 11 security agreement, the Digbys assigned a total of five life insurance policies, three of which were Principal Mutual Life Insurance Company (formerly Bankers Life) policies. Three separate assignments were executed. The Digbys renewed the note on December 22, 1989. They conducted the October 11 and December 22 transactions with Thelma Stone, who from 1989 to 1994 was Executive Vice President, and subsequently became President of the Bank. In her affidavit supporting the motion for summary judgment, Stone attested to a personal acquaintance with the Digbys.

There appears in the record a letter dated October 11, 1989 from Stone to Principal Mutual, purporting to forward copies of the assignments. However, Principal Mutual informed the Bank in 1992 that the company received neither the letter nor copies of the assignments.

In sworn affidavits accompanying the summary judgment response, Digby and his wife alleged that after securing the loan, they received permission from Stone to borrow from the policies in order to meet the quarterly note payments, despite the fact that these policies had already been assigned as collateral on the same note. Specifically, the Digbys claimed that they first obtained permission from Stone in her office at the Bank, and thereafter received permission from Stone by telephone each time the Digbys needed to borrow from the policies to make their loan payments. The Digbys deny that they ever completely depleted these policies. Stone's summary judgment affidavit is silent concerning any such agreement with the Digbys.

At some point before the end of 1991, the Digbys defaulted on the loan. The Bank filed suit on the note in district court in Ector County, and on July 7, 1992, the Digbys signed an agreed judgment in favor of the Bank. In addition to filing suit to collect on the note, the Bank filed with the FDIC a Report of Apparent Crime, dated May 18, 1992. This report alleged that the Digbys

were possible violators of two federal bank fraud statutes [1] and that the Digbys had borrowed against the policies without the Bank's permission. Additionally, the report contained the Bank's unequivocal statement that it first discovered the Digbys' actions with respect to the three life insurance policies when the loan became due. Specifically, the report noted that Stone had discovered the Digbys' unauthorized action; that she had reported it immediately after discovering it; that she was a witness concerning the suspected violation; and that she was one of two representatives of the Bank whom the FDIC could contact for any further information.

The Bank cooperated with the United States Attorney for the Western District of Texas in the formulation of an indictment under 18 U.S.C. § 1344, Criminal Cause Number M093CR085. A federal grand jury indicted Terry L. "Bo" Digby on December 15, 1993. He was acquitted following a jury trial in which Stone testified for the prosecution.

In a single point of error, Digby alleges that the trial court erred in holding that no genuine issue of material fact existed with respect to Digby's claims and in concluding that the Bank was entitled to summary judgment as a matter of law. Before evaluating Digby's contention, we must first review basic legal principles governing claims for malicious prosecution and appellate review of summary judgments.

## MALICIOUS PROSECUTION CLAIMS

 As we recently discussed in *ITT Consumer Financial Corporation d/b/a ITT Financial Services v. Daniel Tovar*, 932 S.W.2d 147 (Tex.App.—El Paso 1996, writ requested), Texas law discourages actions for malicious prosecution. *Parker v. Dallas Hunting and Fishing Club*, 463 S.W.2d 496, 499 (Tex.Civ.App.—Dallas 1971, no writ); *Montgomery Ward & Co., Inc. v. Kirkland*, 225 S.W.2d 906, 909 (Tex.Civ.App.—San Antonio 1949, writ ref'd n.r.e.). Malicious pros-

ecution has been described as inherently tending to stultify the reporting of crimes, an undesirable consequence for public policy. *Brookshire Grocery Co. v. Richey*, 899 S.W.2d 331, 334 (Tex.App.—Tyler 1995, writ granted). Where a business or organization—such as the Bank in the present case—discovers what it believes to be criminal behavior during an internal investigation, public policy requires that there be wide latitude in reporting facts to prosecuting authorities in order that the exposure of crime not be discouraged. *Thomas v. Cisneros*, 596 S.W.2d 313, 317 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.); *Compton v. Calabria*, 811 S.W.2d 945, 949–50 (Tex.App.—Dallas 1991, no writ). As a result, the tort of malicious prosecution "has been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another and the courts have allowed recovery only when the requirements limiting it have been fully complied with." *Reed v. Lindley*, 240 S.W. 348, 351 (Tex.Civ.App.—Fort Worth 1922, no writ). Malicious prosecution addresses the public policy concern that exists in tension with the encouragement of citizens to report possible crimes: protecting innocent citizens from wrongful prosecution. The Texas Supreme Court recently articulated the balance between these two policy considerations in *Browning–Ferris Industries, Inc. v. Lieck*, 881 S.W.2d 288 (Tex.1994).

> What is distinctive about malicious prosecution is that there is little room for error in applying the law. Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct.

*Id.* at 291.

 Texas courts have formulated the elements of malicious prosecution in different ways, but these differences are of little consequence in practical effect. We have followed those decisions that define malicious prosecution as comprised of five elements. A

---

1. 18 U.S.C. § 1014 and 18 U.S.C. § 1344.

plaintiff in a malicious prosecution case has the burden of proving: (1) the commencement of a criminal prosecution; (2) with malice; (3) without probable cause; (4) resulting in an acquittal; and (5) damaging the plaintiff. *ITT Consumer Financial Corporation,* 932 S.W.2d at 160, *citing Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied) and *Dominguez v. Kelly,* 786 S.W.2d 749, 751 (Tex.App.—El Paso 1990, writ denied). *See also James v. Brown,* 637 S.W.2d 914, 918 (Tex.1982). To encourage reporting of crimes, and to ensure that citizens who do so in good faith will not suffer for their actions, plaintiffs must present clear, positive, and satisfactory proof in order to succeed. *Brookshire Grocery Co.,* 899 S.W.2d at 331; *Parker,* 463 S.W.2d at 499; *American Motors Finance Co. v. Cleckler,* 28 S.W.2d 274 (Tex.Civ.App.—Eastland 1930, no writ). The failure of a plaintiff to prove any one of the above elements is fatal to his case. *Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied).

## STANDARD OF REVIEW

■ Summary judgment is proper if the summary judgment record shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* TEX.R.CIV.P. 166a(c). The purpose of summary judgment is the elimination of patently unmeritorious claims or untenable defenses; it is not intended to deprive litigants of their right to a full hearing on the merits of any real issue of fact. *Gulbenkian v. Penn,* 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952). Notwithstanding public policy considerations favoring those who report alleged crimes, a defendant in a malicious prosecution case who moves for summary judgment assumes the burden of showing as a matter of law that the plaintiff has no cause of action against it. Unlike other final judgments reviewed on appeal, we do not review the evidence in cases appealed from summary judgment in the light most favorable to the judgment of the trial court. *Continental Savings Association v. Collins,*

814 S.W.2d 829, 831–32 (Tex.App.—Houston [14th Dist.] 1991, no writ). As explained in *Nixon v. Mr. Property Management Company, Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985), the movant for summary judgment has the burden of showing there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law. In deciding whether there is a disputed material fact issue precluding summary judgment, all admissible evidence favorable to the non-movant will be taken as true, every reasonable inference must be indulged in favor of the non-movant, and all doubts resolved in the non-movant's favor.

■ In order to show as a matter of law that the plaintiff has no cause of action, it is not necessary that the defendant disprove all elements of the plaintiff's claim. If a defendant can disprove any one of the essential elements of the plaintiff's cause of action, then the court should render summary judgment for the defendant. *Compton,* 811 S.W.2d at 949; *Citizens First Nat'l Bank of Tyler v. Cinco Exploration Co.,* 540 S.W.2d 292, 294 (Tex.1976). We will focus on the second and third elements of malicious prosecution—malice and probable cause—because these are the elements the Bank sought to negate below. We will also address whether the affirmative defense raised under federal bank fraud statutes entitled the Bank to summary judgment. Because the trial court did not specify the grounds upon which it granted summary judgment, we must affirm if *any* of the grounds raised by the Bank have merit. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

Before assessing the summary judgment proof presented to the trial court, we must first carefully consider what a plaintiff must demonstrate in order to create a fact issue sufficient to withstand summary judgment on the issues of probable cause and malice.

## PROBABLE CAUSE

■ In a suit for malicious prosecution against a private individual for actions that result in the commencement of a criminal

prosecution, the plaintiff must as a threshold issue demonstrate that the defendant/informant lacked probable cause to report the plaintiff to law enforcement authorities for allegedly criminal acts. If Digby's summary judgment proof fails to create a fact issue as to whether the Bank had probable cause to file the report with the FDIC, then the Bank is entitled to summary judgment.

### Initial Presumption

 Citizens who report criminal activity to prosecuting authorities are protected by an initial, albeit rebuttable, presumption that they acted reasonably and in good faith and, therefore, had probable cause for doing so. *Ellis County State Bank v. Keever,* 913 S.W.2d 605, 607 (Tex.App.—Dallas), *rev'd on other grounds,* 915 S.W.2d 478 (Tex.1995); *Akin v. Dahl,* 661 S.W.2d 917, 920 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984); *Sebastian v. Cheney,* 86 Tex. 497, 25 S.W. 691, 693–94 (1894). The law further protects the informer who makes a full and fair disclosure to the authorities. *Browning–Ferris Indus., Inc. v. Zavaleta,* 827 S.W.2d 336, 345 (Tex.App.—Corpus Christi 1991, writ denied). The plaintiff bears the burden of proving that no probable cause existed for instituting the proceedings in a malicious prosecution case. *Akin,* 661 S.W.2d at 920; *Compton,* 811 S.W.2d at 949–50; *Brookshire Grocery Co.,* 899 S.W.2d at 334.

### Time Frame and Perspective for Evaluating Probable Cause

 When evaluating whether probable cause existed to report the plaintiff to law enforcement authorities, the question arises from whose perspective and from what point in time probable cause should be evaluated. Texas courts have consistently held that probable cause should be evaluated *from the perspective of the person or entity who made the report* to law enforcement authorities, *at the time* that the report was made. After-the-fact judgments made by third parties

cannot serve to confirm or deny the existence of probable cause: "The question is not what the actual facts were, but what [the complainant] honestly believed them to be." *Coniglio,* 756 S.W.2d at 744. *See also Brookshire Grocery Co.,* 899 S.W.2d at 334. In *Akin v. Dahl,* the elderly Dahl brought suit for malicious prosecution against the Akins, who had sought to be appointed as Dahl's guardians and to have Dahl hospitalized. The Texas Supreme Court rejected attempts to demonstrate the existence of probable cause that resulted from legal proceedings and Dahl's confinement after the Akins had contacted legal authorities:

> Events subsequent to the action of confinement and legal proceedings may tend to show whether the action of the Akins turned out to be correct or incorrect, but is not material to the beliefs and motives at the time the proceedings were instituted. *Green v. Meadows,* 517 S.W.2d 799 (Tex. Civ.App.—Houston [1st Dist.] 1975) *rev'd on other grounds,* 524 S.W.2d 509 (Tex. 1975). It is the events prior to the institution of the proceedings which must be examined, and only those events, to determine if the defendants had probable cause to act.

*Akin,* 661 S.W.2d at 920. The Supreme Court specifically disallowed the consideration of subsequent judicial findings in evaluating probable cause, observing that a person who deceives a lower court should not profit from that deception on appeal:

> In this regard, it is also not evidence of probable cause that the probate courts agreed to take the temporary guardianship and commitment action. *Raleigh & Heidenheimer Bros. v. Cook,* 60 Tex. 438, 442 (1883). Holding otherwise would only invite chicanery and allow those misleading the lower courts to profit on appeal by their misdeeds. It is the party instigating the lawsuit in question who receives the scrutiny of the court as to the beliefs and motivations and not the magistrate or tribunal which may have initially been convinced that the prosecution was proper.

*Id.* at 920. In evaluating probable cause, we also cannot consider advice provided by law

enforcement officials to informants who subsequently defend against actions for malicious prosecution. As the Court held in *Compton*, 811 S.W.2d at 949–50:

> The fact that the prosecuting attorney advised the filing of a criminal complaint is not, however, a defense to a malicious prosecution action if the defendant knowingly made false statements concerning material matters to the prosecuting attorney or withheld material facts from the prosecuting attorney. *Andrews v. Dewberry*, 242 S.W.2d 685, 688 (Tex.Civ.App.—Fort Worth 1951, writ ref'd n.r.e.).

The Supreme Court in *Akin v. Dahl* observed that the evaluation of probable cause from the perspective of the informant at the time she contacted law enforcement authorities was a "two-edged sword": the rule protects good faith but mistaken informants, but also prevents those who file bad faith reports from relying on subsequent legal proceedings to justify their actions. *Akin*, 661 S.W.2d at 920. The Court has protected the good faith but mistaken informant under another element of malicious prosecution by holding that a person cannot *cause* a malicious prosecution without *knowingly* supplying false information that results in a criminal prosecution. *Lieck*, 881 S.W.2d at 293.

In evaluating the presence or absence of probable cause for summary judgment purposes in the present case, we must therefore focus exclusively on what Bank officials knew prior to and at the time they filed the report with the FDIC, and exclude from our consideration any advice provided to the Bank by federal officials.

### Reasonable Person Standard for Probable Cause

Because we must evaluate the existence of probable cause from the perspective of the informant at the time that contact is made with a law enforcement authority, the question arises how the facts available to the informant should be evaluated. Probable cause for a criminal prosecution has been defined as the existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within her knowledge, that the person charged was guilty of the crime for which he was prosecuted. *Compton*, 811 S.W.2d at 949–50; *Akin*, 661 S.W.2d at 921; *J.C. Penney Co. v. Gilford*, 422 S.W.2d 25, 28 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). This "reasonable person" standard applies both to situations in which the individual or entity actually initiates criminal prosecution, and to situations in which the individual or entity only acts as an informant. *Zavaleta*, 827 S.W.2d at 345. Where an informant has not made a full and fair disclosure, the undisclosed facts may suggest that *all* the facts available to the informant would not have caused a reasonable person to conclude that the suspected person committed a crime. In such a situation, the informant can lose the protection of the initial presumption.

### Burden of Proof Shifts Upon Showing that Informant Withheld Relevant Facts

A disclosure to law enforcement authorities cannot be "full and fair" either where all the facts available at the time were not sufficient to provoke suspicion in the mind of a reasonable person, or where the informant failed to disclose all the relevant facts to the law enforcement authority; specifically, where the informant disclosed incriminating facts but suppressed exculpatory facts. In such a situation, it may be that the incriminatory and exculpatory facts, taken on balance, would not give rise to probable cause for the informant to report a possible crime. The presumption of good faith reporting and the existence of probable cause are directly related to one another. The presumption of good faith reporting disappears "when the plaintiff produces evidence that the motives, grounds, beliefs and other evidence upon which the defendant acted were indeed not probable cause to commence the proceedings which the defendant instituted." *Akin*, 661 S.W.2d at 920. Conversely, if the party causing the complaint to be filed does not act in good faith in disclosing to the

prosecuting attorney all material facts known to the party, probable cause does not exist. *Compton,* 811 S.W.2d at 949–50; *Eans v. Grocer Supply Co., Inc.,* 580 S.W.2d 17, 21 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). A plaintiff therefore attacks both the presumption of good faith and the existence of probable cause by producing evidence suggesting that the informant withheld relevant exculpatory facts when reporting to law enforcement authorities. Where the plaintiff produces such evidence, the Texas Supreme Court has held:

> The burden of proof then shifts to the defendant to offer independent proof of probable cause. Once these opposing parties have entered into a factual contest on the issue of probable cause, a fact issue is created for resolution by the trier of fact. This is a cornerstone of our judicial system. 'When the facts are in controversy the question of probable cause must necessarily go to the jury, and then the court must give such instruction as will enable them to draw the correct conclusion from the facts as they may find them and the law thus given.' (Citations omitted.) *Landa v. Obert,* 45 Tex. 539, 543 (1876).

*Akin,* 661 S.W.2d at 921. *See also Andrews v. Dewberry,* 242 S.W.2d 685, 689 (Tex.Civ. App.—Fort Worth 1951, writ ref'd n.r.e.)(whether the defendant made a full and fair statement to the prosecuting attorney in instituting the prosecution is a question for the jury).

We recognize that a lax application of the standards outlined by the Texas Supreme Court in *Akin,* 661 S.W.2d at 919–21 could erode the protection afforded those who report crimes, a protection worthy of significant public policy consideration. If the presumption of full and fair disclosure can be rebutted solely by the sworn allegations of the named plaintiff that exculpatory facts existed when law enforcement officials were contacted, then an informant effectively receives no more protection from tort liability than any other defendant. This result is contrary to the expressed intention of Texas courts. However, where the sworn testimo-

ny of more parties than the named plaintiff, as well as other circumstantial evidence, together point to the existence of facts known to the informant that would have caused a reasonable person not to report an alleged crime, then a fact issue exists. Allowing such an issue to be resolved by the trier of fact balances the competing interests of the informant and the person suspected of a crime. We therefore hold the plaintiff to a stringent standard in attempting to rebut the presumption of good faith and full and fair disclosure, while abiding by the law as dictated by the Supreme Court concerning probable cause.

Having outlined the principles necessary to evaluate the issue of probable cause, we now turn to malice.

## MALICE

 Malice is defined as ill will, evil motive, gross indifference, or reckless disregard of the rights of others. *Closs v. Goose Creek Consolidated Independent School Dist.,* 874 S.W.2d 859, 878 (Tex.App.—Texarkana 1994, no writ). Texas courts have consistently held that a plaintiff alleging malicious prosecution does not have to produce direct evidence of malicious intent in order to satisfy this element of the tort. In *Guernsey Community Fed. Credit Union v. Gonzalez,* 539 S.W.2d 896 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.), this Court adopted Dean Prosser's approach to malice in the context of malicious prosecution:

> 'The defendant's improper purpose usually is proved by circumstantial evidence. The plaintiff must establish malice in addition to the absence of probable cause; but, since there can be no legitimate purpose in a prosecution unless there is an honest belief in the guilt of the accused, it is generally agreed that the lack of probable cause may give rise to an inference of malice, sufficient to carry the question to the jury.' Prosser, LAW OF TORTS, 4th ed., at 848–849.

*Guernsey Community Fed. Credit Union,* 539 S.W.2d at 900. Other Texas courts have

also held that the absence of probable cause, or the failure to make full and fair disclosure, can provide circumstantial evidence of a hostile or malicious motive. *See, e.g., Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Ellis County State Bank v. Keever,* 913 S.W.2d 605, 609 (Tex.App.—Dallas), *rev'd on other grounds,* 915 S.W.2d 478 (Tex.1995)(failure to make full and fair disclosure alone can be evidence of a hostile motive); *Eans,* 580 S.W.2d at 21 (failure to make material exculpatory information known to the police could be evidence of a hostile motive or insufficient grounds); *Reed,* 240 S.W. at 351 (to establish malice a plaintiff need not prove that the defendant acted with personal spite, but may simply prove the defendant committed wrongful acts in reckless disregard of another's rights and with indifference as to whether that party would be injured).

■ We therefore conclude that for purposes of summary judgment, evidence capable of raising a fact issue concerning whether the Bank withheld material exculpatory information from federal authorities also provides circumstantial evidence raising a fact issue as to malice.

## FACT ISSUES RAISED BY THE SUMMARY JUDGMENT EVIDENCE

The evidence presented on summary judgment can now be evaluated in light of the principles governing probable cause and malice. We will discuss only these two elements of malicious prosecution because the other three—commencement of a criminal proceeding, acquittal, and damages—are undisputed by the parties.

■ In evaluating whether the summary judgment evidence raises genuine issues of material fact, we note initially that we cannot assess the credibility of witnesses. The Bank has asserted on appeal that the sworn testimony found in the Digbys' affidavits "is contrary to common sense, experience and logic." Such assertions are appropriate for a fact finder but cannot affect our assessment of the summary judgment in the present case. *State v. Durham,* 860 S.W.2d 63, 66 (Tex.1993).

We must accept as true for purposes of summary judgment the allegations raised in the Digbys' affidavits, which accompanied Digby's response to the Bank's motion for summary judgment. Both of the affidavits allege that after securing the loan, Digby and his wife received permission from Stone to borrow from the three Principal Mutual life insurance policies in order to meet the quarterly payments on the note, despite the fact that these policies had already been assigned as collateral on the same note. These affidavits specify that Stone's approval was first obtained in person; thereafter permission was given over the telephone.

By contrast, Bank attorney Mike Atkins and Executive Vice President/President Thelma Stone do not mention the existence of any verbal agreements with the Digbys in their sworn affidavits. Atkins attested that he represented the Bank in February, April, and May 1992 in connection with the Digbys' default. He also stated that he spoke with an FBI agent during this time period concerning possible bank fraud by the Digbys, and was advised that the Bank was required to report the facts concerning the transactions to the FDIC. Atkins prepared the Report of Apparent Crime to the FDIC.

Stone's affidavit stated that she was Vice President of the Bank from 1989 to 1994 and was personally acquainted with the Digbys. She conducted the transactions with the Digbys and sent a letter to Principal Mutual along with copies of the assignments. Stone acknowledged that the Digbys defaulted on the loan and that the Bank filed suit to collect the unpaid balance, resulting in an agreed judgment. She further stated that, *while attempting to collect the judgment,* the Bank acquired knowledge *for the first time* that Digby had withdrawn in the forms of loans all of the cash value from three life insurance policies that had been pledged and

assigned to the Bank.[2] Stone attested that a Report of Apparent Crime was prepared and submitted to the FDIC, and that she was listed as a person who could assist in explaining any documents pertinent to the case. She confirmed that she testified before a federal grand jury and in a subsequent federal criminal trial against Digby fully and to the best of her knowledge.

The Report of Apparent Crime (Long Form) to the FDIC was also presented to the trial court as summary judgment evidence. On this form, the Bank reported that Digby was suspected of the Removal of Secured Property pursuant to two federal bank fraud statutes, 18 U.S.C. § 1014 and 18 U.S.C. § 1344. 18 U.S.C. § 1014 (1976 and Supp. 1996) provides as follows:

### Loan and credit applications generally; renewals and discounts; crop insurance

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of [specified federal or federally insured financial institutions] upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000, or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344 (Supp.1996) provides as follows:

### Bank fraud

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

A short description of the above statutes appears on the form filled out by the Bank, and, as Atkins attested in his affidavit, he assisted in the preparation of this form. The Bank was therefore aware of the potential crimes attributed to Digby by the Bank's report to the FDIC.

The Bank explained the suspected violations of these statutes to the FDIC as follows:

Customer pledged cash values of insurance policies to bank to secure loan and when loan became due bank learned *for first time* that the customer had in spite of said pledge taken all cash values *without the permission of the bank.* [Emphasis added].

Further, the Bank reported to the FDIC that it had notified the insurance company of the Bank's security interest in the insurance policies, but because the company had never received the notice, it allowed Digby to borrow against the policies. The report also lists Stone as Bank President and names her as the person who discovered the alleged fraud, as a witness, and as a person who could provide the FBI and/or the Department of Justice with assistance.

Additionally, the documents presented to the trial court on summary judgment provide circumstantial evidence concerning the Bank's failure to perfect its interest in the policies pledged as collateral, circumstantial evidence that would be consistent with the Digbys' allegation of an agreement with

---

**2.** The statement in Stone's affidavit is in conflict with the report filed with the FDIC. While the report clearly alleges that the Bank learned of Digby's purported fraud "when loan became due", Stone attested that the Bank acquired knowledge for the first time while attempting to "collect the Judgment." The report was filed May 18, 1992; the agreed judgment was not entered until July 20, 1992.

Stone. The letter dated October 11, 1989 from Stone was purportedly intended to notify Principal Mutual that the three policies had been pledged as collateral. There is no evidence that Stone attempted to further contact Principal Mutual in 1989 or 1990.

By contrast, correspondence between Stone and Kelly Sewell of the Paine Webber Company indicates that Stone communicated with Paine Webber prior to October 11, 1989 concerning the two Paine Webber policies that the Digbys had offered as collateral, and then confirmed the telephone conversation with written correspondence that included a copy of the security agreement. There is no such record of telephone communication with Principal Mutual in 1989. However, after the Digbys' default, Principal Mutual responded promptly to inquiries made by Stone concerning loans Digby had made against the policies. Taking the Digbys' affidavits as true, the failure of the Bank to insure that Principal Mutual was placed on notice would be consistent with the existence of verbal agreements between the Digbys and Stone allowing the Digbys to borrow against the policies.

### Probable Cause

■ The Bank alleges that the security agreement, promissory note, affidavits of Atkins and Stone, the Report of Apparent Crime to the FDIC, and related papers presented on summary judgment establish as a matter of law that the Bank had probable cause to report Digby for possible bank fraud at the time the Bank made disclosures to the FBI and the FDIC. Specifically, the Bank alleges that after the Digbys defaulted on the note, Stone discovered for the first time that the Digbys had been borrowing against three of the policies offered as collateral without the Bank's permission. However, whether probable cause existed to report Digby for bank fraud under the federal statutes becomes an issue of fact.

According to Digby and his wife, Stone made a series of agreements permitting them to borrow money against the Principal Mutu-al insurance policies pledged as collateral, then purported to "discover" that the Digbys had borrowed against these policies only after the Digbys defaulted on their loan in late 1991. Stone and other Bank officials then characterized Digby's action as a knowing act of bank fraud, omitting any reference to the series of agreements between Digby and Stone.

Taking the Digbys' affidavits as true, Stone, acting in her capacity as an executive of the Bank, made statements concerning the Digbys she knew to be false. Even if the alleged verbal agreements between Stone and the Digbys were invalid, such agreements would have negated the necessary mental state—"knowingly"—for bank fraud under either of the federal statutes. The circumstantial evidence reflecting Stone's failure to notify Principal Mutual that the Digbys' insurance policies had been pledged as collateral would be consistent with the existence of verbal agreements between Stone and the Digbys. Again, taking the Digby affidavits as true, a reasonable person in Stone's position would not have concluded that Digby had committed bank fraud as contemplated by the federal statutes. If the alleged verbal agreements existed, one cannot say that Stone provided a full and fair disclosure to federal authorities in good faith. The Digby affidavits cause the presumption of good faith and full and fair disclosure to shift away from the Bank, creating a fact issue. *Akin,* 661 S.W.2d at 919–21.

### Malice

■ The presence of malice can be inferred from circumstantial evidence demonstrating an absence of full and fair disclosure in good faith. *Guernsey Community Fed. Credit Union,* 539 S.W.2d at 900. There can be no legitimate purpose in a prosecution unless there is an honest belief in the guilt of the accused. Taken as true, the Digby affidavits raise a genuine issue of material fact as to whether Stone, acting within her scope of employment as a Bank official, misrepresented the events surrounding Digbys' bank loan and caused Digby to face federal crimi-

nal prosecution, knowing these accusations to be false. We find that these factual allegations, for purposes of summary judgment, are sufficient to create a fact issue with respect to the motives of the informant, Thelma Stone.

### AFFIRMATIVE DEFENSE
### OF IMMUNITY

In addition to alleging that fundamental elements of Digby's claim for malicious prosecution were absent, the Bank also asserted on summary judgment the affirmative defense of immunity under federal banking statutes. 31 U.S.C. § 5318(g)(1) & (3)(Supp.1996) provide as follows:

**(g) Reporting of suspicious transactions.—**

**(1) In general.—**The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.

. . .

**(3) Liability for disclosures.—**Any financial institution that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority, and any director, officer, or employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure.

The Bank argues in essence that once it notified the FBI of possible bank fraud by Digby, it was required to file a Report of Apparent Crime (Long Form) to the FDIC pursuant to 12 C.F.R. 353. Further, the Bank urges that a disclosure of this type and under these circumstances constitutes a disclosure of possible violation of the law as

contemplated by 31 U.S.C. § 5318(g)(3) such that is entitled to immunity from liability "under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof."

The Bank's motion for summary judgment and reply to Digby's response to motion for summary judgment presuppose, as an undisputed fact, that Bank officials including Stone made a "full and fair disclosure" to the FDIC, the FBI, the United States Attorney, the federal grand jury, and the federal court. It argues that once a full and fair disclosure has been made, the informant is not required to conduct an investigation to verify the information given in good faith.

■ However, the claim that Bank officials operated in good faith and provided a full and fair disclosure constitute disputed fact issues that cannot be decided on summary judgment. The Bank's report to the FDIC indicates that Stone discovered Digby's allegedly unauthorized loans, provided information to federal authorities, and participated as a witness. Stone is the same Bank official who, according to the Digbys' affidavits, allegedly made verbal agreements to allow the Digbys to borrow against their insurance policies. Whether the Bank made "full and fair disclosure of all known facts" is a disputed fact question. Surely 31 U.S.C. § 5318(g)(3) is not designed to protect the disclosure of facts pertaining to possible bank fraud where the informant withholds critical facts that would cast the entire report to federal authorities in a different light. As the Amarillo Court of Appeals observed with respect to 31 U.S.C. § 5318:

It is recognized that the legislative history of § 5318 manifests an intent by that section's drafters to provide banking institutions and their personnel with broad immunity for disclosures made pursuant to the terms of that section. Yet, even absent a good faith requirement in the statute, there is nothing in it or its legislative history to indicate the drafters intended to clothe banking institutions and their employees with impunity when falsely report-

ing [a] possible violation of the law. Such a notion, even aside from being foreign to our principles of law and sense of justice, was dispelled by the stated purpose of § 5318 'to provide the broadest possible exemption from civil liability for reporting of *suspicious* transactions.'

*Walls v. First State Bank of Miami,* 900 S.W.2d 117, 123–24 (Tex.App.—Amarillo 1995, writ denied). *Walls* involved a malicious prosecution claim against a bank in which there was conflicting evidence on summary judgment concerning whether the defendant bank had reported allegedly fraudulent transactions to the FDIC and, if so, what knowledge the bank possessed when it made the report. The Court required that the bank show itself entitled to the immunity afforded by 31 U.S.C. § 5318:

> [T]here are unresolved the [sic] material fact issues whether the Bank reported a possible violation of law with respect to Walls, and if so, whether such report was made by the Bank knowing it to be untrue. Therefore, the Bank failed to establish as a matter of law its affirmative defense on which the take-nothing summary judgment was rendered. [Authorities omitted].

*Walls,* 900 S.W.2d at 123–24. We agree that the immunity afforded to financial institutions under 31 U.S.C. § 5318 was intended to be broad, but that federal lawmakers could not have contemplated disclosures made where critical mitigating information is deliberately withheld from federal authorities. We conclude that the facts as alleged would raise a fact issue concerning whether Bank officials deliberately withheld information directly relevant to allegations of bank fraud against Digby. We also agree that a defendant bank cannot be entitled to the affirmative defense of immunity under 31 U.S.C. § 5318 where such fact issues are present. We do not believe that such an interpretation does violence to the federal immunity statute. For example, if a bank makes a good faith but mistaken disclosure, it would still enjoy protection. The present case involves the unique circumstance in which a bank is alleged to have known critical information *at the time of its disclosure to the FDIC,* but only disclosed information tending to incriminate the Bank's customer. We find that the Bank was not entitled to the affirmative defense afforded by 31 U.S.C. § 5318.

## STATUTE OF FRAUDS AND PAROLE EVIDENCE RULE

The Bank has raised two additional grounds for sustaining its summary judgment that do not appear in the record from the court below, both of which urge us on substantive grounds to disregard the Digbys' affidavits filed with Plaintiff's Response to Defendants' Motion for Summary Judgment. We conclude that the Bank's arguments, based on the statute of frauds and the parol evidence rule, do not prevent us from considering the Digby affidavits as competent summary judgment evidence.

■ Tex.R.Civ.P. 166a(c) states in pertinent part: "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." Although this section of Rule 166a refers to arguments considered on appeal for *reversal* of a summary judgment motion, both parties to a summary judgment must present all arguments, in writing, to the trial court. The Texas Supreme Court has specifically held that a summary judgment cannot be *affirmed* on a ground not presented to the trial court in the motion (or other written response). *Stiles v. Resolution Trust Corporation,* 867 S.W.2d 24, 26 (Tex.1993); *Travis v. City of Mesquite,* 830 S.W.2d 94, 100 (Tex. 1992). *See also McConnell v. Southside Independent School District,* 858 S.W.2d 337, 343 (Tex.1993); *Clark v. First National Bank of Highlands,* 794 S.W.2d 953, 956 (Tex.App.—Houston [1st Dist.] 1990, no writ)(appellate court cannot glean from pleadings or proof any grounds for granting the summary judgment other than those expressly set forth before the trial court).

■ The requirement that all issues on appeal from a summary judgment must have been raised before the trial court does not

928

apply to *substantive* objections to the non-movant's affidavits attached to the response to the motion for summary judgment. Because the rules do not require a written reply to a non-movant's response on summary judgment, substantive objections to the non-movant's affidavits may be raised for the first time on appeal. *See Ceballos v. El Paso Health Care Systems,* 881 S.W.2d 439, 443–45 (Tex.App.—El Paso 1994, writ denied).

■ First, the Bank argues in essence that the parol evidence rule eliminates any consideration of alleged verbal agreements made subsequent to a written loan agreement and therefore renders it inadmissible as a matter of law. The Bank characterizes the Digbys' affidavits as alleging that the Digbys and Stone amended the original loan agreement verbally. However, in examining the note and the security agreement between the Digbys and the Bank, we observe initially that the alleged verbal agreements subsequent to the creation of the written loan agreement between Digby and the Bank would be relevant to the issue of bank fraud, and therefore to malicious prosecution for bank fraud, whether or not those verbal agreements turned out to be valid. The existence of such agreements would provide evidence of Digby's mental state. As such, it is questionable whether the parol evidence rule applies to the tort allegation. *See City of Houston v. Goings,* 795 S.W.2d 829, 833 (Tex.App.—Houston [14th Dist.] 1990, writ denied).

■ Second, we note that we may consider the verbal agreements alleged to have been made subsequent to the original written contract even if we apply the parol evidence rule. In the absence of an integrated written agreement, the rule serves only to exclude evidence of agreements made prior to or contemporaneously with a writing, not subsequent modifications. *See for example Mortgage Company of America v. McCord,* 466 S.W.2d 868, 871 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.). In the present case, we find no indications that the note and security agreement were intended

to represent the final, integrated agreement between the parties. For example, the Bank retained the prerogative to unilaterally revise the terms of the agreement. The following terms are found in paragraph 9 of the security agreement:

Concerning the indebtedness of Borrower to Bank comprising the Obligation, Bank, in its discretion without in any manner impairing its rights and powers hereunder, may, at any time and from time to time, without further consent of or notice to Pledgor, and with or without valuable consideration, (i) make loans or advances to Borrower, or otherwise incur or acquire obligations of Borrower; (ii) renew or extend the maturity of or accept partial payments upon the Obligation or any part thereof; (iii) release any person primarily or secondarily liable in respect thereof; (iv) alter in any manner that Bank may elect the terms of any instrument evidencing the Obligation or any part thereof either as to the maturity thereof, rate of interest, method of payment, parties thereto or otherwise; (v) renew, extend or accept partial payments upon, release or permit substitutions for or withdrawals of, any security (other than the collateral) at any time directly or indirectly, immediately or remotely, securing the payment of the Obligation or any part thereof; and (vi) release or pay to Borrower, or any other person otherwise entitled thereto, any amount paid or payable in respect of any such other direct or indirect security for the Obligation, or any part thereof.

Other language in the security agreement suggests the possibility of modifications subsequent to the written agreement as well. Clearly, paragraph 9 contemplates a tremendous range of possible modifications affecting the terms of the loan, the security provided for the loan, or both, subsequent to the creation of the security agreement.

Moreover, the security agreement between the Bank and the Digbys contains no merger clause such as the one provided as a model in TEX.BUS. & COM.CODE ANN. § 26.02(e)(Vernon Supp.1997) for loan agreements exceeding fifty thousand dollars ($50,000):

This written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

There are no unwritten oral agreements between the parties.

TEX.BUS. & COM.CODE ANN. § 26.02(f)(Vernon Supp.1997) provides that if the suggested language for merger clauses contained in § 26.02(e) does not appear in a loan agreement, the terms of TEX.BUS. & COM.CODE ANN. § 26.02 do not apply to the agreement, but the agreement is nevertheless valid. The Austin Court of Appeals has analyzed this statute and concluded from a careful reading of Chapter 26 and related provisions that the failure to include a merger clause such as the one suggested in TEX.BUS. & COM.CODE ANN. § 26.02(e) renders admissible parol evidence of agreements allegedly made subsequent to the writing. *Maginn v. Norwest Mortgage, Inc.,* 919 S.W.2d 164, 168 (Tex.App.—Austin 1996, n.w.h.)("Examining the statute as a whole, we conclude that the penalty for failing to comply with § 26.02(e) is to allow the written contract to be controverted by parol evidence."). We conclude that the language of the security agreement and note in the present case would not preclude consideration of parol evidence suggesting the existence of agreements made subsequent to the original writings.

 With respect to the statute of frauds, we acknowledge that on first impression, the Bank's argument would appear to bar consideration of the verbal agreements between Stone and the Digbys as alleged in the Digbys' affidavits. The Austin Court of Appeals has held that when tort claims have their nucleus in an alleged oral contract which is unenforceable under the statute of frauds, the statute of frauds bars the tort claims as well. *Maginn,* 919 S.W.2d at 168–69, *citing Collins v. Allied Pharmacy Management, Inc.,* 871 S.W.2d 929, 936 (Tex. App.—Houston [14th Dist.] 1994, no writ). More careful consideration, however, suggests that this rule of law would not serve to bar the allegations of oral agreements be-tween Stone and the Digbys. In *Collins,* the Houston Court of Appeals rejected a claim for common law fraud where the plaintiff's breach of contract claim was barred by the statute of frauds. The court held that where the plaintiff's injury is economic loss from the failure of the contract, the tort claim is barred as well. In *Maginn,* by contrast, the plaintiffs did not allege economic loss from the failure of a contract, the terms of which were unenforceable under the statute of frauds, but rather alleged damages resulting from negligent misrepresentations by the defendant bank that it would lend the plaintiffs money, and damages that allegedly resulted from the plaintiffs' reliance on these misrepresentations. The present case more closely resembles *Maginn.* Digby's claim for malicious prosecution depends on allegations that the Digbys made verbal agreements with a Vice President of the Bank, not that those agreements were valid in contract law. Even if Stone and the Digbys mistakenly entered into verbal agreements that would fail under the statute of frauds to modify the original contract, this failure would not defeat Digby's claim of malicious prosecution. Without respect to the validity of the verbal agreements, if Stone induced the Digbys to rely on invalid verbal agreements and thereby breach their oral agreement with the Bank, and if Stone then denied the existence of the verbal agreements, reported the Digbys for bank fraud to the FDIC, and witnessed against the Digbys in a federal criminal trial, then fact issues exist for a malicious prosecution claim. None of these alleged facts rely on the enforceability of the alleged verbal agreements. Where a plaintiff alleges a tort based on a verbal agreement and the tort does not rely on the validity of the agreement or breach thereof, the statute of frauds does not bar the tort claim.

## CONCLUSION

We sustain Digby's point of error. The summary judgment is reversed and the case remanded for trial.