Terry THRIFT, Jr., Appellant,

v.

Sandra HUBBARD k/n/a Sandra Hubbard Venable, Appellee.

No. 04–96–01013–CV.

Court of Appeals of Texas,
San Antonio.

Feb. 25, 1998.

Opinion Dissenting from Denial of Rehearing May 6, 1998.

Review Denied Oct. 15, 1998.

W. Wendell Hall, Fulbright & Jaworski, L.L.P., San Antonio, for appellant.

Darby Riley, Law Office of Darby Riley, Thomas B. Black, San Antonio, for appellee.

Before STONE, GREEN and ANGELINI, JJ.

## OPINION

ANGELINI, Justice.

This is an appeal from a jury verdict in favor of Sandra Hubbard in her suit against Terry Thrift for malicious prosecution. In four points of error, Thrift contends that the evidence is both legally and factually insufficient to support the jury's findings of malicious prosecution, damaged reputation, emotional distress, and lost earning capacity. In an additional point of error, Thrift contends that the jury charge contained an erroneous theory of law. We affirm the judgment of the trial court.

### Factual and Procedural Background

This complex set of facts began in 1985 when Victor[1] and Sandra Hubbard were seeking investors for a new software company they were starting. The Hubbards had been employees in the software division of Peerless Equipment Company ("PECO") when they developed a software program that attracted a tremendous amount of attention. PECO and the Hubbards agreed that the Hubbards would spin PECO's software division into an independent company, Peerless Technologies Corporation ("Peerless"), in order to develop and market the new program ("EMIS"). PECO retained the rights to inventory, equipment, and the software at its current level. The Hubbards were majority stock holders, officers, and employees of Peerless.

When Peerless spun off from PECO, the Hubbards needed capital to get the company off the ground. The Hubbards were introduced to Terry Thrift, who agreed to invest in Peerless after receiving assurances that the Hubbards's stock was not pledged and that the Hubbards's salaries were capped. He continued to invest in the company over the course of several months. In February

of 1986, Thrift issued to Peerless a $100,000 line of credit. The loan was secured by (1) Peerless's accounts receivable less than 75 days old, unless otherwise approved by Thrift, and (2) all of Peerless's other assets. There was also a stock pledge agreement effective February 19, 1986, whereby the Hubbards pledged half of their stock to Thrift in further satisfaction of the loan.

In October of 1986, Thrift notified the Hubbards in writing that Peerless was insolvent because of unpaid debts, back employment taxes, and failure to pay interest on the line of credit. Thrift demanded payment in full on the line of credit and laid claim to all of Peerless's assets pursuant to the security agreement. He instructed the Hubbards that they could not sell or buy any permanent asset of the company, nor could they pay corporate officers without his consent. He demanded accurate and up to date operating statements, financial statements, and an estimate of sales and cash needs.

Sandra Hubbard testified that Thrift also demanded that half of the Hubbards's stock be transferred to his name on the company books pursuant to the stock pledge agreement. Peerless's stock transfer records indicate that 600,000 shares of Peerless stock were transferred from the Hubbards to Thrift on January 16, 1987, making him the majority shareholder of Peerless. Thrift testified that he requested possession of the pledged stock, which he received, but that the Hubbards transferred the stock to him in the company books on their own volition.

Sandra testified that Peerless was in dire financial straits, but that it had promising prospects. Peerless was behind in payment of rent, employment taxes, and employee wages. Sandra testified that, from the point of the stock transfer, she and her husband considered Thrift to be the majority shareholder in Peerless. Therefore, she claims that Peerless's financial condition was fully disclosed to Thrift. She claims that, per Thrift's request, she prepared status reports of Peerless's progress almost weekly for Thrift's review. Thrift acknowledges requesting but denies receiving these status

---

1. While Victor Hubbard is essential to the factual development of this case, he has since passed

away. Neither he nor his estate have been involved in the malicious prosecution case.

reports. He testified that he requested them so that he could determine whether he wanted to extend the line of credit he had given Peerless.

In December of 1986, Sandra Hubbard testified that Thrift and Peerless engaged in a "check swap" loan, whereby Thrift gave a $13,000 check to Peerless for use in a hardware purchase and Peerless gave Thrift a post-dated $13,000 check in repayment. There was not enough money in the account to cover Peerless's check, but, because Peerless had overdraft coverage protection, the bank paid the check anyway.

Also in December of 1986, it became necessary for Peerless to obtain the rights to the EMIS software that PECO had retained when Peerless was formed. The evidence is disputed regarding the impetus of this transaction. Thrift contends that Victor Hubbard beseeched him to purchase PECO's interest in the EMIS software because Peerless could not afford the lease payments. Conversely, Sandra Hubbard testified that Thrift approached the Hubbards about him personally obtaining rights to the software through Peerless so that he would not be identifiable as the purchaser. Sandra Hubbard further testified that the company attorney advised Thrift to purchase the software rights on his own, but that Thrift insisted on doing it through Peerless.

In any event, Thrift gave Peerless the $100,000 asking price to purchase the EMIS software rights from PECO. However, there was an $87,122.85 IRS levy on Peerless's account when Thrift's check was deposited, so $87,122.55 of the $100,000 intended to be used to purchase the EMIS rights was taken by the IRS as soon as the check was deposited. Sandra Hubbard testified that she was not aware of the IRS levy when the check was deposited. The evidence reflects that, in order to repay Thrift his $100,000, Peerless issued Thrift a note in the amount of $87,-122.55 and paid him the $12,877.15 difference by check. Thrift eventually purchased the EMIS rights on his own for $75,000.

As the result of a sale to Wrigley Company, Peerless was due to collect $49,484 in the spring of 1987. Sandra Hubbard testified that in January of 1987, Peerless's landlord was threatening to lock the doors because of unpaid rent. She claims that, in a meeting with Thrift, he instructed the Hubbards to reduce office space. The Hubbards, knowing Peerless needed to be current on its lease before it could move its offices, agreed to assign $21,227.64 of the Wrigley account receivable to the landlord in satisfaction of Peerless's obligations under the lease. This assignment was made in January of 1987. Sandra Hubbard testified that Thrift was aware of this assignment.

On February 19, 1987, Thrift and Peerless executed another line of credit in the amount of $109,776.10. This line of credit extended the original 1986 line of credit and included unpaid interest on the 1986 note. The second note was collateralized with Peerless's accounts receivable. However, neither party disputes that no credit was made for assets already appropriated and stock already taken when Thrift foreclosed on the 1986 note.

Thrift contends that the Hubbards listed the value of the accounts receivable at $140,-000 in order to induce Thrift to extend the loan. It is undisputed that, except for the Wrigley account and another $10,000 of the accounts receivable, the remaining accounts listed were older than 75 days at the time the security agreement was signed. The security agreement on the second note indicates that the collateral does not include accounts receivable older than 75 days absent Thrift's consent. Sandra Hubbard testified that she gave Thrift a list of the accounts receivable on a regular basis. Thrift acknowledges receiving at least one of these lists showing accounts receivable up to January 22, 1987. This list included the age of each account. According to Sandra Hubbard, by agreeing to use the accounts receivable as collateral for the note, Thrift either did not intend to collateralize the old receivables or he consented to use them as collateral pursuant to the terms of the security agreement. Sandra Hubbard was under the impression that only the receivables less than 75 days old were collateralized.

Thrift also contends that several of the accounts receivable listed by the Hubbards were fictitious, particularly a $101,704 receiv-

able from NACO. Thrift testified that he discovered that no money was due from NACO when he later took over the company. Sandra Hubbard testified that the receivable was listed accurately at the time the list was made, but that the deal later fell through.

Also in February of 1987, Thrift made Peerless another loan. Peerless needed money to purchase hardware in order to complete the Wrigley contract. Thrift wrote Peerless a check for $17,981, indicating that it was a 14 day loan. On the same date, Peerless wrote Thrift a check for $17,981, post-dating it 11 days. Sandra Hubbard testified that this transaction was another "check swap" loan. She stated that she post-dated the check 11 days because she was expecting some receivables and she felt sure there would be money to cover the check in the Peerless account within that time. Thrift testified that this transaction was not a "check swap" loan. He contends that he made the loan on assurances that he would be paid back out of the Wrigley account. Sandra Hubbard testified that she never stated Peerless would pay the $17,981 back from the Wrigley account. The money loaned was to buy hardware to complete the Wrigley contract. She stated that there is no way Peerless could have purchased the hardware, completed the contract, invoiced the Wrigley Company, and been paid in 11 days.

In March of 1987, Thrift had still not deposited the $17,981 check, apparently on the advice of the Hubbards. In a March 9, 1987, status report, Sandra Hubbard notified Thrift that Peerless was still waiting on money "from several large accounts (e.g.Wrigley's)—so I'll let you know as soon as your check can go through!" In another status report dated May 18, 1997, Sandra Hubbard notified Thrift that the Wrigley receivable had come in. The letter stated that the money was used to pay the landlord pursuant to the assignment, back wages (including those due the Hubbards), and critical operating bills. In explanation, the letter continued:

> Peerless does not have the money to pay you right now the $17,981 it owes you. The Wrigley money and the Bank One

money was just barely enough to keep the company afloat. I made a judgment call with these funds—one necessary to the survival of Peerless (and therefore to protect all of us). You may not have agreed with it, but it seemed to be the right thing to do at the time.

\* \* \* \*

I thought about calling you at the time but reasoned to myself that it would make no difference, considering how badly things had deteriorated—and the very best thing that I could do for you was to protect your total investment by trying to keep Peerless alive long enough to reduce the overheads. With a reduced overhead, if it could not make it on its own cash, then it could at least tread water long enough to be sold and leave you (and everyone else) whole.

Also in this letter, Sandra Hubbard notified Thrift that she and Victor Hubbard had become self-employed agents for one of Peerless's major account resellers. She stated they had done this in order to take a large part of their salaries out of Peerless's overhead. Following Thrift's receipt of this letter in the latter part of May, 1987, Thrift and the Hubbards had several meetings regarding Peerless. Thrift asked the Hubbards to sign several documents which would enable him to recover what he could of his investment. Thrift presented letters to himself and others that he had drafted on Victor Hubbard's behalf. Thrift asked Victor Hubbard to sign the letters, all of which were introduced into evidence. The first letter authorized Thrift to receive and cash any checks that came into Peerless. The second letter notified all Peerless customers to make payments directly to Thrift. Victor Hubbard signed both of these letters.

A third letter operated to effectually give all Peerless assets and equipment to Thrift free and clear of all other creditors. It stated that Peerless could not continue operation "because of severe insolvency," and it gave Thrift access to all of Peerless's equipment and records. The letter also stated that the company furniture and equipment was not where it was supposed to be. Finally, the letter asked Thrift to allow the Hubbards to

continue working with him as agents or software writers. Thrift testified that he felt the letter would be a simple way to disentangle himself from Peerless without being too hard on the Hubbards. Sandra Hubbard testified that she and Victor refused to sign the third letter because they felt it contained untrue statements and was unethical.

Thrift acknowledges that he threatened to file fraud charges against the Hubbards because they refused to comply with his wishes. Sandra Hubbard testified that Thrift said, "I have friends, and I can do it" when making the threat. Thrift claims that the threat was idle and used merely as a negotiation tool.

In a letter dated May 22, 1987, the Hubbards resigned from the company. The letter acknowledged Thrift's majority interest in the company and his desire to transfer company assets. It continued by stating that the Hubbards did not want to be a part of such activity because they felt Peerless had a good chance of paying its other creditors if it continued to operate.

Also on May 22, 1987, Thrift turned over all of his Peerless stock to the company attorney. He contends he did this before he received the Hubbards's letter of resignation. Sandra Hubbard contends that he turned in the stock after he received their letter. Sandra Hubbard testified that she believes Thrift turned in his stock because he did not want to be totally responsible for the company's liabilities after the Hubbards resigned. Thrift claims he returned the stock because it was worthless and because the Hubbards were abdicating responsibility for Peerless by claiming that Thrift was the majority stockholder.

Shortly thereafter, Thrift took over the Peerless office. Bill Shaefer, Peerless's chief operating officer testified that Thrift entered the office on a Friday morning and introduced himself as the majority stockholder. He offered the employees their jobs and agreed to pay them back wages if they would continue to work for him. However, Thrift later explained to the employees that he could not pay the back wages because it would cause him to be liable for other Peerless debts. Thrift instructed Schaefer to fire the Hubbards's son, who was working for the

company, because he did not want a Hubbard working at his company. Schaefer testified that Thrift seemed surprised to learn that the Hubbards were working somewhere else marketing EMIS. Thrift told Shaefer that "[The Hubbards] don't know who they're messing with. I'll get even with them no matter how long it takes." Thrift continued the company as EMIS Software, Inc. for several years and eventually sold it.

On May 26, 1987, Thrift and the Hubbards entered into a separation agreement regarding Peerless. Among other things, the agreement provided that Thrift would regain possession of company equipment, receive title to all accounts receivable, and obtain possession of the company offices. The agreement further provided that Thrift would assume responsibility for employee wages and rent obligations. The Hubbards retained the right to sell EMIS as a "major account reseller" and to use the fixed assets already in their possession in doing so. Finally, the agreement provided that Thrift would not pursue fraud charges against the Hubbards and that the Hubbards would not represent to anyone that Thrift assumed any liability of Peerless or that he was a shareholder, officer, director or employee of Peerless. Thrift testified that he included this last provision in the agreement because the Hubbards were referring creditors and unhappy customers to him, claiming that he owned the company software and was "in charge."

The agreement provided that "It is apparent that there are no funds immediately available that would be adequate enough to satisfy [Thrift's] demands...." Nevertheless, on June 4, 1987, Thrift deposited the $17,981 check. Predictably, the bank would not honor the check. Thrift testified that he deposited the check in spite of his knowledge of Peerless's insolvency because he was "hoping there might be [some money in the account]." On the other hand, Sandra Hubbard contends that Thrift deposited the check knowing there was no money in the account in order to obtain a check with a NSF stamp and set the Hubbards up for fraud charges.

On July 9, 1997, Thrift sent the Hubbards a letter declaring the separation agreement null and void. He claimed that the Hubbards deceived him regarding the collectability and existence of accounts receivable, refused to return company equipment, and failed to otherwise abide by the agreement. Sandra Hubbard testified that, on July 13, 1987, she and Victor Hubbard sent Thrift a letter rebutting the allegations in his July 9, 1987, letter and informing Thrift that, if the separation agreement was void, they would compete with him in the market place.

On July 20, 1997, Thrift filed a complaint with the Bexar County District Attorney's Office against the Hubbards, alleging theft of accounts receivable. Thrift testified that he filed the complaint pursuant to the directions of Assistant District Attorney Ben Sifuentes. He does not remember what documents he attached to the complaint, but he repeatedly testified that he "stand[s] by [his] complaint." The jury was not provided with the complaint actually filed as Thrift had thrown his copy away and the D.A.'s office could not locate its file. A copy of the complaint obtained from Thrift's attorney in a related civil suit was admitted at trial. The jury was instructed regarding the situation and allowed to make its own decision regarding the veracity of the complaint actually admitted.

In the complaint, Thrift alleged that (1) he gave the Hubbards a note against Peerless's accounts receivable in the amount of $109,776 in an effort to refinance a previous note scheduled to come due; (2) a list of receivables in the amount of $140,392.75 was pledged by the Hubbards in exchange for this note; (3) a check for $17,981 was added to the principle amount of the note; (4) the Hubbards never reported Peerless's progress as he had requested; (5) he went to their office and found that they were gone and had started a new business as an agent of Peerless so they could siphon profits from Peerless; (6) the Hubbards purposefully and unlawfully reduced the receivables to $7,887.25; and (7) the Hubbards had included a fictitious account receivable (NACO) in the original list of pledged receivables.

Assistant District Attorney Ben Sifuentes was assigned to the case. He reviewed the complaint and conducted an independent evaluation. Sifuentes testified that, during his investigation, he was operating under an assumption, created by Thrift, that Thrift was attempting to purchase Peerless when the alleged acts took place. The case was eventually transferred to Assistant District Attorney Jane Davis who also conducted an investigation. Davis testified that she thought that the case against the Hubbards was very good. Three years later, in March of 1990, a grand jury indicted Victor Hubbard. In December of 1990, Sandra Hubbard was also indicted on two counts of misapplication of funds, one count of fraud, and one count of theft. The case was reset a number of times over the next three years. During that time, Victor Hubbard passed away.

During the course of the prosecution, the case was again reassigned, this time to Assistant District Attorney Dwight Chumbley. Chumbley testified that the case was old by the time he got it, but that Thrift stayed involved, offering to provide him meticulously kept documents. He testified that he believed there was enough evidence against Sandra Hubbard to support an indictment. However, he also testified, via affidavit, that there was insufficient evidence to convict or otherwise prove the allegations beyond a reasonable doubt. On December 6, 1993, Chumbley filed a motion to dismiss the case. The motion to dismiss reflects that Chumbley's explanation for dismissing the case was: "[co-defendant] deceased. In the interest of justice."

On August 26, 1994, Sandra Hubbard sued Terry Thrift for malicious prosecution. The case was tried to a jury. The jury returned a verdict in favor of Sandra Hubbard, finding that she had been damaged in the amount of $524,760. Thrift filed a motion for new trial, a motion to disregard the jury findings, and a motion for judgment notwithstanding the verdict, all of which were denied by the trial court. A judgment reflecting the jury's verdict was entered and this appeal ensues.

## ARGUMENT AND AUTHORITY

In his first four points of error, Thrift challenges the legal and factual sufficiency of

the jury's verdict as it pertains to both liability and damages. In considering a legal insufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). In considering a factual sufficiency point, we must assess all the evidence and reverse for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Under this analysis, we are not fact finders, we do not pass upon the credibility of witnesses, nor do we substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be supported. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

## I. MALICIOUS PROSECUTION

In his first point of error, Thrift contends that the evidence is both legally and factually insufficient to support the jury's finding of malicious prosecution. This court has recently noted that in order to prevail in a malicious prosecution case, the following elements must be established: (1) a criminal prosecution was commenced against the plaintiff; (2) the prosecution was initiated or procured by the defendant; (3) the prosecution terminated in favor of the plaintiff; (4) the plaintiff was innocent; (5) the defendant lacked probable cause to instigate the prosecution; (6) the defendant acted with malice in bringing about the prosecution; and (7) the plaintiff suffered damages as a result of the prosecution. *Zess v. Funke,* 956 S.W.2d 92, 93 (Tex.App.—San Antonio 1997, n.w.h.); *see Browning–Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288, 292–93 (Tex.1994). In cases of malicious prosecution, a delicate balance must be struck between the interest of society in the good faith reporting of suspect criminal conduct and the interest of the individual in freedom from unjustifiable and oppressive litigation of criminal charges. *Lieck,* 881 S.W.2d at 290. In order to protect this delicate balance, courts must require strict proof of each element of the cause of action. *Id.* at 291. However, as with any other cause of action, if the elements are proved, liability is established. *Id.; see Ellis County State Bank v. Keever,* 888 S.W.2d 790, 793 (Tex.1994).

### A. Commencement and Causation

There is no dispute that a criminal prosecution was commenced against Hubbard, thereby establishing the first element of a malicious prosecution cause of action. However, Thrift contends that Hubbard failed to prove that Thrift initiated or procured the commencement of the prosecution. A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities. *Lieck,* 881 S.W.2d at 292. A person procures a criminal prosecution if his actions are enough to cause the prosecution, and but for his actions, the prosecution would not have occurred. *Id.* A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. *Id.* Thrift argues that because he did not direct Hubbard's arrest and because the District Attorney's Office and the grand jury exercised sole discretion in deciding to prosecute Hubbard, he could have neither initiated nor procured the prosecution.

In the present case, Thrift filed a sworn, notarized complaint form with the District Attorney's office. The complaint itself states that it is made for the sole purpose of instituting criminal prosecution where the investigation indicates criminal activity. The complaint lists Sandra Hubbard as a co-defendant and repeatedly accuses her of numerous illegal acts. While Thrift argues that the mere filing of a complaint does not constitute the initiation of a criminal prosecution, we find it unnecessary to address this contention because, even though the decision to prosecute Hubbard was ultimately made

by the District Attorney's office, the jury had sufficient evidence to believe that Thrift intentionally included false and misleading information in his complaint. Thus, the evidence is sufficient to support a finding that Thrift procured the prosecution of Sandra Hubbard.

Specifically, Thrift indicated in his complaint to the District Attorney that the $17,981 check was a part of the second line of credit he extended to Peerless. However, the trial evidence indicates that the $17,981 was a separate and independent loan. Thrift also told the District Attorney that the Hubbard's pledged to him accounts receivable in the amount of $140,392.75, when there is evidence that he knew this to be untrue. He further claimed that he was not kept up to date on the operations of Peerless. However, Sandra Hubbard testified that reports were given to Thrift almost weekly. In fact, several of those reports were admitted into evidence.

Further, Thrift implied in his complaint that, on May 19, 1987, he was surprised to learn that the Thrift's had "started another business" in order to siphon Peerless profits. Conversely, the evidence reveals that Thrift knew the Hubbards were acting as major account resellers for Peerless and that he agreed to them acting as such. Finally, Assistant District Attorney Ben Sifuentes testified that he conducted his investigation of the Hubbards and Peerless based upon information given to him by Thrift that was untrue, that is that Thrift was attempting to purchase Peerless when the alleged theft took place. Accordingly, the evidence is sufficient to establish that the criminal prosecution of Sandra Hubbard would not have occurred but for the complaint filed by Terry Thrift.

### B. Resolution in Hubbard's Favor

██ Thrift further contends that the evidence is insufficient to support a finding that the prosecution in this case ended in Sandra Hubbard's favor. Particularly, Thrift argues that an action terminates in favor of the accused only where there has been an acquittal and a resolution of some or all of the factual elements of the case. In the present case, Thrift claims that because there was no resolution or adjudication of the facts under-

lying the criminal charges against Hubbard, the jury should not have concluded that the prosecution ended in her favor.

However, in addressing the same issue, several Texas courts, including our supreme court, have held otherwise. *See Davis,* 752 S.W.2d at 523; *Leal v. American Nat. Ins. Co.,* 928 S.W.2d 592, 597 (Tex.App.—Corpus Christi 1996, writ denied); *Closs v. Goose Creek Consol. Ind. School Dist.,* 874 S.W.2d 859, 878 (Tex.App.—Texarkana 1994, no writ); *see also Lang v. City of Nacogdoches,* 942 S.W.2d 752, 758 (Tex.App.—Tyler 1997, writ denied) (implying favorable dismissal where criminal charges were dismissed). In *Davis,* the supreme court specifically rejected an argument similar to Thrift's, holding that termination on the merits is not a necessary requirement of a malicious prosecution cause of action. *Davis,* 752 S.W.2d at 523. The court held that "even when the termination is indecisive as to the accused's guilt, it is nevertheless favorable if the prosecution cannot be revived." *Id.* Likewise, in *Leal,* the court held that dismissal of the criminal charges against the accused constituted termination on the merits where the prosecutor testified that he concluded that the criminal prosecution might not be successful. *Leal,* 928 S.W.2d at 597; *see also Closs,* 874 S.W.2d at 878.

In the present case, Assistant District Attorney Dwight Chumbley testified that he dismissed the case after conducting the prosecution for eight to ten months and concluding that it was no longer a good case. He acknowledged that there was probable cause to support the original indictment, but that there was not enough evidence to obtain a conviction. This evidence is clearly sufficient to support a finding that the prosecution in this case terminated in Sandra Hubbard's favor.

### C. Probable Cause

██ Finally, Thrift contends that the evidence is insufficient, in all respects, to support a finding that Thrift lacked probable cause to initiate a criminal prosecution against Sandra Hubbard. Probable cause for the initiation of a criminal prosecution exists when the relevant facts and circum-

stances would excite belief in the mind of a reasonable person that the individual accused is guilty of the crime for which he is prosecuted. *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984).

In determining whether probable cause exists in a malicious prosecution case, the trier of fact must determine "whether the complainant reasonably believed that the elements of a crime had been committed based on the information available before the criminal proceedings began." *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 519 (Tex. 1997). It is, therefore, important that the probable cause inquiry focus only on the actions of the complainant, based upon his perspective of the facts at the time the report was made, and not on the subsequent actions of third-parties or information discovered after the fact. *Akin,* 661 S.W.2d at 921; *Digby v. Texas Bank,* 943 S.W.2d 914, 920 (Tex. App.—El Paso 1997, writ denied).

The defendant in a malicious prosecution case is afforded the initial presumption that he acted reasonably and in good faith in initiating a criminal proceeding against the plaintiff. *Richey,* 952 S.W.2d at 517; *Keever,* 888 S.W.2d at 794; *Akin,* 661 S.W.2d at 920. However, this presumption is rebutted when the plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause to commence the proceeding. *Id.* The burden then shifts to the defendant to prove he acted with probable cause. *Id.* When the facts surrounding the impetus of the defendant's decision to instigate a criminal prosecution are in dispute, the issue of probable cause becomes a mixed question of law and fact to be resolved by the jury. *Richey,* 952 S.W.2d at 518; *Akin,* 661 S.W.2d at 920.

While we may not agree with the jury's finding of lack of probable cause in this case, there is certainly sufficient evidence to support such a finding. Thrift accused Sandra Hubbard of theft of accounts receivable. Specifically, he accused her of misrepresenting the value of Peerless's accounts receivable, giving him a "bad check" in repayment of a loan he made to Peerless, and misappropriating the money received from the Wrigley account. The list of accounts receivable Thrift alleges was misrepresented to him clearly shows the age of each account. The security agreement relevant to the line of credit he issued specifically provides that he did not have to accept as collateral any receivable older than 75 days. The jury could have reasonably concluded that the receivables were honestly represented to Thrift and that he made the conscious decision to issue the line of credit in spite of the large percentage of old receivables contained on the list. The evidence certainly supports the fact that Thrift could not have believed that Sandra Hubbard personally pledged the old receivables because their own security agreement prevented her from doing so without Thrift's approval.

Thrift himself testified that the $17,981 note was not part of the line of credit as he claimed in his complaint to the District Attorney. He further testified that he deposited Peerless's $17,981 check when he knew the Peerless account was insolvent and he knew why. There is evidence that Thrift was aware that a large portion of the Wrigley receivable had already been pledged to Peerless's landlord before he claimed that his $17,981 loan was collateralized by the Wrigley account. The evidence also supports a finding that Thrift was aware that his $17,981 loan might not be paid out of the Wrigley receivable as he stated in his complaint. Letters from Sandra Hubbard to Thrift also support a finding that Thrift was aware that the Peerless receivables he claimed the Hubbards stole were used for legitimate business purposes.

Thrift's testimony concerning his good faith belief that the Hubbards had stolen his investment is compelling. However, the evidence also supports a finding that Thrift was a disappointed investor who gambled and lost on a fledgling company that could not keep its head above water. Where the evidence supports differing conclusions, we must defer to the jury's verdict. It is reasonable to interpret the evidence in this case as proving that Thrift filed his criminal complaint against the Hubbards, knowing it was specious, in an attempt to avenge his lost invest-

ment or to gain an advantage in the civil litigation stemming from these same facts. In fact, Thrift testified that his own attorney advised him against filing charges against the Hubbards when he threatened to do so. When viewed in this manner, the evidence is sufficient to support a finding that Thrift did not reasonably believe the Hubbards had stolen money from him, and, therefore, lacked probable cause to instigate criminal proceedings against Sandra Hubbard.

### D. Malice

■■■■ With respect to the element of malice, Thrift argues that the evidence is insufficient to support a finding that he acted with malice in reporting Hubbard's conduct to the District Attorney's Office. Malice may be established by either direct or circumstantial evidence and may be inferred from lack of probable cause. *Digby*, 943 S.W.2d at 922; *Fisher v. Beach*, 671 S.W.2d 63, 67 (Tex. App.—Dallas 1984, no writ). Malice is generally defined as ill will, evil motive, gross indifference, or reckless disregard of the rights of others. *Digby*, 943 S.W.2d at 922; *Closs*, 874 S.W.2d at 878.

In the present case, there is sufficient evidence to demonstrate that Thrift acted with malice in filing the complaint accusing Sandra Hubbard of theft. There is evidence that Thrift was aware of exculpatory facts that he did not disclose to the District Attorney, specifically in regard to his exercise of control over Peerless operations, the circumstances surrounding the $17,981 loan, his prior knowledge of the collectability of the accounts receivable, and his beliefs regarding the Wrigley account. Moreover, there is evidence that he threatened the Hubbards with criminal charges and vowed to "get even" with the Hubbards.

We conclude, based upon a thorough review of the record, that the evidence in this case is sufficient to support the jury's affirmative finding regarding each element of malicious prosecution. Thrift's first point of error is overruled.

## II. DAMAGES

In his second through fourth points of error, Thrift disputes the sufficiency of the evidence supporting the jury's findings of damages. The jury awarded Hubbard $437,-300 in damages: $2,500 in attorney's fees, $275,000 for injury to reputation; $150,000 for emotional distress; and $9,800 for lost wages.

### A. Injury to Reputation

■■■ In his second point of error, Thrift contends that the evidence does not support the jury's award of damages for injury to Hubbard's reputation. He argues that there is no evidence that Hubbard possessed a certain amount of respect in the community that she lost as a result of the criminal charges against her. He further claims that the evidence is insufficient because there was no evidence that Hubbard's indictment was ever publicized.

At trial, Hubbard testified that she was extremely involved in the computer software business prior to her indictment. She had been and continued to work with large corporations and government agencies designing computer software. In her opinion, she had "quite a very good reputation" in the technology industry. Hubbard also testified that she was heavily involved in church activities and that she taught fifth grade Sunday school.

After the indictment was returned against her, Hubbard testified that she chose not to continue seeking promising employment opportunities with government agencies because she would have had to disclose that there was an indictment pending against her. She also chose not to attempt to sell technology she had developed because industry-wide due diligence requirements mandated that she disclose the indictment. Because the indictment is still on her record, she continues to be required to disclose its existence in her business dealings. Likewise, she will always have to disclose the indictment on official forms and applications asking for such information. According to Hubbard, "it is a poison pill" and "it killed [her] reputation." Her stepdaughter stated, and the jury apparently agreed, that "nobody is going to want to work with somebody ... with that kind of reputation."

As for her church activities, Jerry Horn, one of Hubbard's friends from church testified that Sandra relinquished her responsibilities and decreased her involvement in church activities. He testified that, if information regarding her indictment had been widely known, it would have discredited her ministry.

Thrift did not counter any of this evidence. Under these circumstances, the jury reasonably concluded that Hubbard had suffered damage to her reputation in the amount of $275,000. Such a finding is reasonable in light of the gross social stigma attached to criminal charges that Hubbard will be burdened with both professionally and socially as long as the indictment remains on her record. Thrift's second point of error is overruled.

### B. Emotional Distress

■ In his third point of error, Thrift contends that the evidence is insufficient to support the jury's award of damages for emotional distress because the award necessitates an inference of humiliation. We disagree. The evidence reflects that Hubbard was indicted by a grand jury of four counts of criminal activity reflecting negatively on her character, and that she remained under indictment for over three years. Hubbard testified that she had to sit with other criminal defendants who were chained and attended by guards during her fifteen court appearances. She further testified that, during these hearings, she endured "glossy eyed" on-lookers "pawing" at her and asking why she was there. She spent over three years assisting in her defense and fearing a conviction of unfounded charges. She testified that it was "terrible."

Hubbard testified that she discontinued her church activities because she feared misleading people about her faith if they discovered that she was under indictment. She also worried about her business dealings and feared applying for certain projects because she would be compelled to disclose the indictment. Hubbard's criminal attorney testified that she was many times, "crying, a nervous wreck." Hubbard's stepdaughter testified that the Hubbards's criminal defense took up "pretty much all of their time and all of their

thoughts and everything ... I mean they worked hard to get where they were, and it was all gone, taken away."

Thrift's contention that the award of damages for emotional distress required evidence that Hubbard could not sleep or eat, required medication or psychiatric care, experienced depression, or fell into substance abuse as a result of the charges against her is unfounded. The evidence in this case supports a finding that Hubbard's daily routine was substantially disrupted by fear and anxiety related to the charges pending against her, not to mention by the emotional strain surrounding her preparation for and attendance at over 15 court proceedings as a criminal defendant. The jury's award of $150,000 for mental anguish was, therefore, appropriate. Thrift's third point of error is overruled.

### C. Lost Wages

■ In her fourth point of error, Thrift contends that the evidence is insufficient to support the jury's award of damages for past lost wages. The evidence introduced at trial in support of Hubbard's claim for lost wage damages consists of Hubbard's estimation that she spent approximately 98 hours preparing for, traveling to, and making seven four-hour court appearances and seven ten-hour court appearances while the indictment was pending. She testified that if she had not been traveling and making court appearances, she would have been working. She further testified that her standard billing rate for programming was $100 an hour.

Thrift argues that the evidence is insufficient to support the award of lost wages because Hubbard's testimony constituted speculation. However, Thrift did not object to this allegedly speculatory testimony at trial nor did he offer any controverting evidence. Hubbard's testimony was clear, definitive, and within her personal knowledge— it was not speculative. Accordingly, the evidence is sufficient to support the jury's award of lost wage damages in the amount of $9,800. Thrift's fourth point of error is overruled.

### III. THE JURY CHARGE

In his final point of error, Thrift complains that the trial court erred in overruling his objection to the jury instruction regarding malice. The jury instruction actually given allowed the jury to make an affirmative finding regarding the malice element of malicious prosecution if it determined:

> that Terry Thrift, Jr. acted with malice in initiating or procuring the criminal prosecution, or that he initiated or procured it primarily for a purpose other than to bring an offender to justice;
>
> > "Malice" is ill will or evil motive or such gross indifference or reckless disregard for the rights of others as to amount to wanton and willful action, knowingly and unreasonably done.

As discussed above, a finding of malice is necessary to a successful malicious prosecution case. Malice has been consistently defined by Texas courts as it was defined by the court's charge in this case: ill will, evil motive, gross indifference, or reckless disregard. *See Fisher,* 671 S.W.2d at 67; *Dahl v. Akin,* 645 S.W.2d 506, 515 (Tex.App.—Amarillo 1982), *aff'd,* 661 S.W.2d 917 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). However, the court's charge in this case goes beyond the common law definition of malice and allows an affirmative finding of the malice element upon proof that the prosecution was sought "primarily for a purpose other than to bring an offender to justice." Thrift argues that the instruction given in this case is erroneous because it enabled the jury to find malice on alternative grounds: either by finding malice as it is generally defined or by finding that Thrift filed his complaint for some other reason than to obtain justice.

While the charge in this case allowed the jury to find malice based upon a legal theory not generally recognized in Texas case law, the instruction given is consistent with the theory of malice established in the Restatement Second of Torts. The Restatement provides that:

> [t]o subject a person to liability for malicious prosecution, the proceedings must have been initiated primarily for a purpose

other than that of bringing an offender to justice.

RESTATEMENT (SECOND) OF TORTS § 668 (1997); *see* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 119 at 883 & n. 65 (5th ed.1984) (citing *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963), *cert. denied,* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964) for proposition that malice is established where the defendant's primary purpose was something other than the bringing an offender to justice).

It is Thrift's burden to establish that he was harmed by the trial court's submission of the allegedly erroneous malice issue to such a degree that the error probably caused the rendition of an improper judgment. TEX. R.APP. P. 44.1(a) (formerly TEX.R.APP. P. 81(b)(1)). Contrary to Thrift's contention, the fact that the jury may have relied upon a legal theory submitted in error does not necessarily require reversal because it does not affirmatively demonstrate that the error probably caused rendition of an improper judgment. *Provident American Ins. Co. v. Castaneda,* 914 S.W.2d 273, 277 (Tex.App.— El Paso 1996, writ granted).

In order to make a sufficient showing of harm, Thrift must show that there is no or insufficient evidence to support a finding based upon the correct portion of the malice issue submitted to the jury. *Ford Motor Co. v. Pool,* 688 S.W.2d 879, 882 (Tex.App.— Texarkana 1985), *aff'd in part and rev'd in part,* 715 S.W.2d 629 (1986) (affirming holding of appellate court in regard to proposition at issue); *Bernstein v. Portland Sav. & Loan Assoc.,* 850 S.W.2d 694, 702 (Tex. App.—Corpus Christi 1993, writ denied). In other words, if the evidence is not sufficient to demonstrate that Thrift acted with ill will, evil motive, gross indifference, or reckless disregard in filing his complaint against the Hubbards, then it is more likely than not that the jury found malice based upon the Restatement definition. However, as discussed above, the evidence in this case is more than sufficient to demonstrate that Thrift's complaint was filed with ill will, evil motive, gross indifference, or reckless disregard. Accordingly, we find that, if the jury

charge in this case was in fact erroneous, the error is harmless.

Because we find that Thrift suffered no harm as a result of the inclusion of the Restatement definition of malice in the jury charge, we will not pass on the actual propriety of the charge. Thrift's fifth point of error is overruled.

The judgment of the trial court is affirmed.

GREEN, Justice, dissenting on motion for rehearing.

Appellant's motion for rehearing should be granted on the damages issues. Because the panel majority has voted to deny the motion, I respectfully dissent.